IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DR. MOHAMED R. MAHFOUZ, as Seller's Representative and on behalf of TechMah CMF LLC, <br><br> Plaintiff, <br><br> v. <br><br> DEPUY SYNTHES PRODUCTS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 25-445-JLH-EGT |

**REPORT AND RECOMMENDATION**

Presently before the Court is Defendant DePuy Synthes Products, Inc.'s ("Defendant" or "DePuy") motion to dismiss the Complaint for failure to state a claim. (D.I. 23). For the reasons set forth below, the Court recommends that DePuy's motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART.

**I.    BACKGROUND**

This case arises from a joint development project gone awry. Dr. Mohamed R. Mahfouz ("Plaintiff") was approached by Johnson & Johnson subsidiary, DePuy, to develop certain craniomaxillofacial ("CMF") products. (D.I. 2 ¶¶ 2 & 3). DePuy encouraged Plaintiff to create TechMah CMF LLC ("TechMah") to develop the CMF products and to receive venture capital funding from Johnson & Johnson Innovation ("JJDC"). (*Id.* ¶ 23). After Plaintiff founded TechMah, JJDC funded 75% of TechMah's budget, and Plaintiff and his business partners funded the rest. (*Id.* ¶ 24). To formalize the development plans, TechMah and DePuy entered into a Development Agreement in early December 2023 to create certain CMF products. (*Id.* ¶¶ 5, 25; *see also* D.I. 2, Ex. A). As part of the Development Agreement, TechMah and DePuy created a Work Plan that set out development goals and established a Joint Steering Committee ("JSC") to

guide the development. (D.I. 2 ¶ 29; *see also* D.I. 2, Ex. A at Annex A). At the same time the Development Agreement was formed, TechMah and DePuy also entered into an Interest Purchase Agreement ("IPA") that required DePuy to purchase Plaintiff's (and other's) interests in TechMah if the "Purchase Trigger" provision of the IPA was satisfied. (D.I. 2 ¶¶ 27-28). Relevant here, the IPA incorporated the provisions of the Development Agreement (*id.* ¶ 28; *see also* D.I. 2, Ex. B § 11.07), and the IPA's Purchase Trigger specifically incorporated portions of the Development Agreement's Work Plan (D.I. 2 ¶¶ 28-29; *see also* D.I. 2, Ex. B § 1.02).

The Work Plan set forth deadlines for the completion of certain development milestones for the CMF products. (D.I. 2 ¶¶ 33-37). One such milestone was obtainment of FDA clearance for the Release 2 Product under Section 510(k) of the Federal Drug and Cosmetic Act, which governs pre-market notice by manufacturers intending to market a medical device. (D.I. 2 ¶¶ 35 & 37; D.I. 2, Ex. A at Annex A § 2.2.3.1).[1] The Work Plan set a deadline of January 31, 2024 for this regulatory clearance for the Release 2 Product. (D.I. 2, Ex. A at Annex A § 2.2.3.1).

Under the terms of the Development Agreement, if TechMah reasonably anticipated that it would fail to meet one of the Work Plan's deadlines, TechMah could notify the JSC and – subject to the JSC's approval of a revised development plan – prevent DePuy from asserting its right under Section 9.4 to terminate the Development Agreement early for failure to meet a milestone deadline. (D.I. 2 ¶¶ 41, 43; *see also* D.I. 2, Ex. A §§ 9.1, 9.4). The Development Agreement further provided that TechMah was entitled to a termination fee if DePuy exercised this right to terminate. (D.I. 2 ¶ 43; *see also* D.I. 2, Ex. A § 9.4).

---

[1] "Release 2 Product" includes preoperative planning software for surgeons, design software to create titanium plates and implants, and titanium surgical guides for reconstructive surgery of the midface and eye socket. (D.I. 2, Ex. A at Annex A §§ 2.1.1 & 2.2.1.1; *see also* D.I. 2, Ex. A at Annex F).

In January 2023, TechMah had a pre-submission meeting with the FDA for its Release 2 Product. (D.I. 2 ¶ 56). The Release 2 Product was ultimately granted 510(k) clearance on July 11, 2024. (*Id.* ¶ 64). At that point, TechMah believed that it had satisfied the Purchase Trigger of the IPA, but DePuy disagreed. (*Id.* ¶ 65). Over the ensuing months, the parties conferred at length about whether TechMah had satisfied the Purchase Trigger. (*Id.* ¶¶ 66-73). Meanwhile, during this time, DePuy continued to conduct due diligence on acquiring TechMah – diligence that had begun on February 1, 2024. (*Id.* ¶ 71).

By November 12, 2024, DePuy asserted that TechMah had not satisfied a condition precedent for DePuy's obligation to close – namely, that 510(k) regulatory clearance for the Release 2 Product be obtained by January 31, 2024. (*Id.* ¶¶ 74-75). DePuy therefore refused to purchase Plaintiff's interest in TechMah under the IPA. (*Id.* ¶ 74). On April 9, 2025, Plaintiff responded by filing this derivative action on TechMah's behalf pursuant to Federal Rule of Civil Procedure 23.1. (*Id.* ¶¶ 96, 99-110). Plaintiff asserts claims for breach of the IPA (Count I) and the Development Agreement (Count II), as well as claims for conversion (Count III) and misappropriation of trade secrets under the Delaware Uniform Trade Secret Act ("DUTSA") (Count IV) and the federal Defend Trade Secrets Act ("DTSA") (Count V). (*See id.* ¶¶ 111-59).

On May 23, 2025, DePuy filed the present motion to dismiss all claims of the Complaint. (D.I. 23). Briefing was complete on September 12, 2025. (D.I. 24, 29 & 30).

## II.  LEGAL STANDARD

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232-33 (3d Cir. 2008). The Court is not, however, required to accept as true bald assertions, unsupported conclusions or unwarranted inferences. *See Mason v. Delaware*

3

*(J.P. Court)*, C.A. No. 15-1191-LPS, 2018 WL 4404067, at *3 (D. Del. Sept. 17, 2018); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Dismissal under Rule 12(b)(6) is only appropriate if a complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). This plausibility standard obligates a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead, the pleadings must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (cleaned up).

### III. DISCUSSION

The Court begins with the claim at the center of this dispute – breach of the IPA. The Court then turns to the breach of the Development Agreement claim, followed by the trade secret misappropriation claims and the conversion claim.

#### A. Breach of the Interest Purchase Agreement (Count I)

Plaintiff asserts that DePuy's refusal to purchase TechMah constitutes a breach of the IPA. (D.I. 2 ¶ 114). DePuy argues that the IPA creates a condition precedent to its obligation to acquire TechMah – and that the condition precedent was not met here. (D.I. 24 at 11; D.I. 30 at 3). Specifically, DePuy claims that the Purchase Trigger of the IPA (D.I. 2, Ex. B §§ 1.02 & 8(e)) incorporates the regulatory milestones from the Development Agreement's Work Plan (D.I. 2, Ex. A at Annex A § 2.2.3) to create a condition precedent relating to regulatory approval. As DePuy points out (D.I. 24 at 11), Section 2.2.3 of the Work Plan outlines Release 2 deliverables, requiring

4

"510(k) clearance of [the] Release 2 Product [and] any updates to Release 1 Product" be obtained "[n]o later than January 31, 2024." (D.I. 2, Ex. A at Annex A § 2.2.3.1). In DePuy's view, TechMah was required to obtain 510(k) regulatory clearance for the Release 2 Product by January 31, 2024 in order to trigger DePuy's purchase obligations under the IPA. (D.I. 24 at 11; D.I 30 at 2-4). Because Plaintiff admits that TechMah did not meet the January 31, 2024 deadline, DePuy argues that it was under no obligation to acquire TechMah. (D.I. 24 at 11; *see also* D.I. 2 ¶ 78). There being no obligation to purchase, DePuy contends that Plaintiff's claim for breach of IPA must be dismissed. (D.I. 24 at 11-13).

Plaintiff does not dispute that, by the terms of the IPA, the Purchase Trigger is a condition precedent to DePuy's obligation to close. (*See* D.I. 29 at 4-5). Plaintiff disagrees, however, that the January 31, 2024 deadline was part of the condition precedent. (*Id.* at 5-7). In support, Plaintiff points to Section 2.1 of the Development Agreement, which states that the Work Plan provides "the key milestones and expected Completion Dates." (*Id.* at 6). Emphasizing use of the word "expected," Plaintiff argues that the 510(k) clearance itself is the focus of the condition precedent – not the January 31, 2024 date. (*Id.* at 5-7). Plaintiff also argues that the specific deadline to obtain regulatory clearance did not matter because the Development Agreement did not make time of the essence, as evidenced by the existence of the "Work Plan Delay" Section 3.6 of the Development Agreement and the absence of a "time is of the essence" clause. (*Id.* at 6; *see also* D.I. 2, Ex. A § 3.6).[2]

---

[2] Plaintiff obtained the Release 2 Product clearance, albeit five months after January 31, 2024. (D.I. 2 ¶ 64). In Plaintiff's view, the Development Agreement does not mandate clearance by the deadline, and TechMah is instead provided with a reasonable time period within that deadline to obtain clearance. (D.I. 29 at 6). Whether TechMah obtained clearance within a reasonable amount of time after the January 31, 2024 deadline – a fact issue – is only relevant if the date itself is not material to the condition precedent.

5

Turning to the IPA, the agreement unambiguously provides that completion of the Purchase Trigger is a condition precedent to DePuy's obligation to close. (D.I. 2, Ex. B § 8.02(e) ("The Purchase Trigger shall have been achieved by [TechMah].")). Indeed, the Purchase Trigger and other provisions of Article VIII are defined as "the 'Conditions Precedent.'"[3] (D.I. 2, Ex. B § 1.02). And DePuy's obligation to "consummate the purchase" of TechMah is explicitly described as "subject to the satisfaction" of the conditions outlined in Article VIII, one of which is the "Purchase Trigger." (*Id.* §§ 8.01 & 8.01(e)). By the clear terms of the IPA, the Purchase Trigger is a condition precedent to DePuy's obligation to purchase TechMah. (*Id.* § 1.02 ("[N]otwithstanding anything to the contrary in this Agreement, unless and until the Purchase Trigger has been achieved and each of the Conditions Precedent is satisfied or waived, [DePuy] shall not be obligated to consummate the [purchase of TechMah].")). And the IPA's definition of the Purchase Trigger expressly includes "completion of Section 2.2.3 of the Work Plan" (D.I. 2, Ex. B § 1.02), with Section 2.2.3 of the Work Plan requiring "[n]o later than January 31, 2024, 510(k) clearance of Release 2 Product any updates to Release 1 Product" (D.I. 2, Ex. A at Annex A § 2.2.3.1). In the Court's view, the January 31, 2024 date is unambiguously part of the condition precedent and therefore 510(k) clearance by this date was required to trigger DePuy's obligation to close.

Plaintiff argues that the specific deadline for 510(k) clearance is not "mandatory" or a "strict condition precedent" because there is no language in the Development Agreement making time of the essence and, further, because extensions were contemplated. (D.I. 29 at 5-7). Although

---

[3] Pursuant to the Interpretation provision of the IPA (D.I. 2, Ex. B § 11.04), the Court does not consider that Article VIII itself uses the header "Conditions Precedent." *See Penton Bus. Media Holdings, LLC v. Informa PLC*, 242 A.3d 445, 461 (Del. Ch. 2018) ("When interpreting a contract, the role of a court is to effectuate the parties' intent. Absent ambiguity, the court will give priority to the parties' intentions as reflected in the four corners of the agreement." (cleaned up)).

not articulated clearly as such, Plaintiff appears to be arguing that the condition precedent (including the January 31, 2024 deadline) was not a material term of the IPA. "Courts may excuse a condition precedent in cases where a party demonstrates that the condition precedent was not a material part of the agreement and satisfies the requirements for disproportionate forfeiture." *Thompson St. Cap. Partners IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A.3d 1151, 1177 (Del. 2025). Whether a term is material is generally a question of fact that is typically not suited for resolution at the motion to dismiss stage. *See id.* at 1169 & nn. 87-89. At this pleading stage and on this record, the Court is unable to determine the materiality of the deadline for the Purchase Trigger (including the January 31, 2024 deadline for 510(k) clearance)).

Plaintiff also argues that, even if the Purchase Trigger required strict compliance by the January 31, 2024 deadline, DePuy waived compliance with the deadline after TechMah complied with Section 3.6 of the Development Agreement (Work Plan Delay). (D.I. 29 at 7-10). This argument fails for two reasons. First, Section 3.6 only applies to the Development Agreement and DePuy's ability to terminate the Development Agreement. (D.I. 2, Ex. A § 3.6 ("Only in the event the JSC is (a) unable to agree on a corrective plan for such Work Plan Delay; and (b) such Work Plan Delay would . . . delay the (i) 510(K) clearance of Release 2 Product . . . then [DePuy] may terminate this Agreement in accordance with Section 9.4.")). Nothing in either the IPA or Development Agreement indicates that this delay process applies to (or affects in any way) the IPA's Purchase Trigger deadlines. Second, the IPA has a non-waiver provision, which states that neither party waives any right under the agreement by failing to assert that right; it also provides that either party may extend the time for the other's performance or waive any condition – as long as that is in writing. (D.I. 2, Ex. B § 10.05). Delaware courts routinely enforce non-waiver provisions. *See, e.g.*, *IAC Search, LLC v. Conversant LLC*, C.A. No. 11774-CB, 2016 WL

69995363, at *10 (Del. Ch. Nov. 30, 2016). But Plaintiff never alleges that DePuy excused performance or waived any condition in the requisite signed writing. And Plaintiff's argument that DePuy voluntarily and intentionally relinquished its right despite the non-waiver provision is without plausible factual support in the Complaint. *See Phunware, Inc. v. Excelmind Grp Ltd.*, 117 F. Supp. 3d 613, 626-27 (D. Del. 2015) (granting a motion to dismiss because the complaint lacked facts indicating that defendant intended to waive the termination provision – despite defendant's continued work towards closing the acquisition); *see also Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 739 (D. Del. 2016) (provision requiring written waiver can be orally waived).[4] The Court is not persuaded by Plaintiff's argument that DePuy waived the 510(k) clearance deadline.

Ultimately, whether DePuy breached the IPA by failing to purchase TechMah turns on whether the Purchase Trigger condition precedent is a material part of the agreement. Because the Court cannot determine at this stage whether that condition precedent – including the specific January 31, 2024 deadline for 510(k) clearance – was a material term, the Court recommends that Defendant's motion to dismiss be denied for breach of the IPA.[5]

## B.   Breach of the Development Agreement (Count II)

Plaintiff also asserts a breach of contract claim based on the Development Agreement in the alternative. (D.I. 2 ¶¶ 125-129; D.I. 29 at 13). The Development Agreement was to remain in effect until (1) DePuy purchased TechMah, (2) it was terminated as allowed by the terms of the

---

[4]   To be clear, Plaintiff never alleges in the Complaint that DePuy waived the non-waiver provision – orally or otherwise.

[5]   As it is unnecessary to do so, the Court does not reach Plaintiff's remaining arguments opposing dismissal of the IPA claim. (*See, e.g.*, D.I. 29 at 10-12 (DePuy's obligation to close survived beyond TechMah's delayed satisfaction of the Purchase Trigger); *id.* at 10 n.2 (DePuy waived the natural termination date of the Development Agreement); *id.* at 9 n.1 (equitable estoppel)).

agreement or (3) April 1, 2024. (D.I. 2, Ex. A § 9.1). According to the Complaint, TechMah engaged in the delay process under Section 3.6 of the Development Agreement, thereby precluding DePuy's ability to terminate under Section 9.4 after the Release 2 Product's clearance was delayed. (D.I. 2 ¶¶ 78-81). Plaintiff further alleges that DePuy then terminated the Development Agreement without paying TechMah the termination fee outlined in Section 9.4, thereby constituting a breach. (*Id.* ¶¶ 81 & 127; *see also* D.I. 29 at 13-14).[6] Defendant insists that the Development Agreement naturally expired by its own terms on April 1, 2024. (D.I. 24 at 10).

As Defendant points out (D.I. 24 at 10-11), Plaintiff does not plausibly allege – with factual support – that DePuy terminated the agreement under Section 9.4 rather than the agreement naturally expiring on April 1, 2024. Indeed, Plaintiff does not allege **when** or **how** the Development Agreement was terminated at all. The closest that Plaintiff comes is by conclusorily alleging that "[DePuy] breached the Development Agreement by purporting to terminate it without paying [TechMah]" the termination fee. (D.I. 2 ¶ 127). But that is plainly insufficient. Absent some allegation that termination occurred prior to April 1, 2024, the Court cannot draw a reasonable inference that the Development Agreement was terminated pursuant to Section 9.4 prior to the agreement's expiration under Section 9.1. *See Artesian Water Co. v. State, Dep't of Highways & Transp.*, 330 A.2d 441, 443 (Del. 1974) ("The general rule is that a contract remains in force until and unless it has been terminated according to its terms or by actions of the parties.").

To overcome this pleading deficiency, Plaintiff raises two theories not found in the Complaint. First, Plaintiff argues that DePuy constructively terminated the agreement before the April 1, 2024 deadline. (D.I. 29 at 13-14). But the Complaint says nothing about constructive

---

[6] TechMah is only entitled to the termination fee if DePuy terminated the Development Agreement pursuant to Section 9.4. (*See* D.I. 2, Ex. A § 9.4).

9

termination. There are no factual allegations – plausible or otherwise – that suggest DePuy terminated the Development Agreement before the April 1, 2024 expiration (constructively or at all).[7] Plaintiff next argues that DePuy waived the April 1, 2024 termination provision by continuing to work with TechMah, "passively allowing the Development Agreement to continue." (D.I. 29 at 14). But, like the IPA, the Development Agreement has a non-waiver provision, which states that a party's delay or failure to exercise a right does not constitute waiver of any other right. (D.I. 2, Ex. A § 10.9). Plaintiff has not adequately pled that DePuy exercised a "voluntary and intentional relinquishment" of rights as required to overcome this non-waiver provision. *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982); *Phunware, Inc.*, 117 F. Supp. 3d at 626-27; *Lennox Indus., Inc. v. Alliance Compressors LLC*, C.A. No. N18C-03-045 AML CCLD, 2021 WL 4958254, at *8 n.77 (Del. Super. Ct. Oct. 25, 2021); *Weyerhaeuser*, 204 F. Supp. 3d at 739.

Because Plaintiff does not plausibly allege that the Development Agreement was terminated as opposed to having naturally expired on April 1, 2024, the Court recommends that Plaintiff's claim for breach of the Development Agreement be dismissed.

    **C.**    **Trade Secret Misappropriation Under DUTSA and DTSA (Counts IV & V)**

Plaintiff argues that he should be permitted to pursue claims for trade secret misappropriation of "the Products" (D.I. 2 ¶¶ 145, 147, 154, 157) under both DUTSA and the DTSA as an alternative to his breach of contract claims. (D.I. 29 at 16-17). But there cannot be misappropriation when the "acquisition, disclosure, and use of a trade secret ha[s] been expressly authorized by contract." *Epazz, Inc. v. Nat'l Quality Assurance USA, Inc.*, No. 20-1552, 2021 WL 3808946, at *10 (6th Cir. Aug. 26, 2021).

---

[7] The paragraphs cited by Plaintiff in support of this theory (D.I. 29 at 13 (citing D.I. 2 ¶¶ 78-81, 127-28)) do not plausibly allege that termination occurred before April 1, 2024.

The Development Agreement provided DePuy a "perpetual, . . . nonexclusive, royalty-free, fully paid-up, . . . worldwide license under the Work Product IP for all uses in the Field . . . which license will survive the termination of this Agreement (except in case of termination of this Agreement by [TechMah] in accordance with Section 9.2)." (D.I. 2, Ex. A § 5.5.2). "Work Product IP" includes "any Intellectual Property controlled by [TechMah]" that "(a) covers, claims, or is incorporated into, or (b) that is otherwise necessary or useful for . . . the exploitation of the Work Product." (*Id.* § 1.1.18). "Work Product" includes "the Products" and "any other information generated in connection with performing the activities under the Work Plan." (*Id.* § 1.1.17). And "Products" as defined in the Development Agreement covers the same products that are the basis for Plaintiff's trade secret claims, including the Release 2 and Release 3 Products. (*Compare id.* § 1.1.67 ("'Products' means the products set forth in the Work Plan, including the Release 1 Product, the Release 2 Product and the Release 3 Product."), *with* D.I. 2 ¶ 4 (Complaint defining "Products" as certain CMF products contemplated by IPA), *and* D.I. 2 ¶ 10 ("By retaining the Products after repudiating the IPA, [DePuy] also misappropriated [TechMah]'s trade secrets . . . ."); *see also* D.I. 2 ¶¶ 142-45 & 151-54).

Because DePuy obtained a perpetual license under the Development Agreement – a license that survived the agreement's termination – DePuy retains the right to continue using TechMah's asserted trade secrets. As such, Plaintiff cannot legally plead that DePuy "improperly used" these alleged trade secrets as required under DUTSA or that DePuy misappropriated the trade secrets as required under the DTSA. *See Elenza, Inc. v. Alcon Lab'ys Holding Corp.*, 183 A.3d 717, 721 (Del. 2018) (DUTSA); *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (DTSA); *see also* UNIF. TRADE SECRET ACT § 1 cmt. 1 (UNIF. L. COMM'N 1985) ("Proper means

11

include . . . [d]iscovery under a license from the owner of the trade secret."). The Court thus recommends that the trade secret misappropriation claims be dismissed.

### D. Conversion of TechMah's Intellectual Property (Count III)

Finally, DePuy seeks to dismiss Plaintiff's conversion claim. (D.I. 24 at 13-17; *see also* D.I. 2 ¶¶ 130-40). Plaintiff's conversion claim is apparently premised on DePuy's use of TechMah's intellectual property. (D.I. 2 ¶¶ 136-40). That is preempted by DUTSA. *See Alarm.com Holdings, Inc. v. ABC Capital Partners, Inc.*, 2018 WL 3006118, at *11 (Del. Ch. June 15, 2018), *aff'd*, 204 A.3d 113 (Del. Feb. 7, 2019); *iBio, Inc. v. Fraunhofer USA, Inc.*, 2020 WL 5745541, at *14 (Del. Ch. Sept. 25, 2020) (finding preemption when the "conversion claim rests on the same facts as [the] misappropriation claim"). There are no factual allegations that differentiate Plaintiff's conversion claim from his DUTSA misappropriation claim. (*See* D.I. 2 ¶ 137 ("The Products . . . are [TechMah's] intellectual property.")). The conversion claim appears preempted and, as such, the Court recommends that claim be dismissed.

### IV. CONCLUSION

For the foregoing reasons, the Court recommends that DePuy's motion to dismiss (D.I. 23) be GRANTED-IN-PART and DENIED-IN-PART.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b)(1) and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be limited to ten (10) pages and filed within fourteen (14) days after being served with a copy of this Report and Recommendation. *See* FED. R. CIV. P. 72(b)(2). Any responses to the objections shall limited to ten (10) pages and filed within fourteen days (14) after the objections. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which is available on the court's website, https://www.ded.uscourts.gov.

Dated: December 19, 2025

_____
UNITED STATES MAGISTRATE JUDGE