IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DR. MOHAMED R. MAHFOUZ, as Seller's Representative and on behalf of TechMah CMF LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 25-445-JLH-EGT |
| DEPUY SYNTHES PRODUCTS, INC., | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

Presently before the Court is the renewed motion of Plaintiff Mohamed R. Mahfouz ("Plaintiff") for leave to amend the complaint. (D.I. 142). For the reasons set forth below, Plaintiff's motion is GRANTED-IN-PART and DENIED-IN-PART.

## I. BACKGROUND

The Court set forth a detailed factual background in a prior opinion. (*See* D.I. 43 (R&R); *see also* D.I. 72 (R&R adopted)). The Court will not revisit those facts and instead will only discuss facts relevant to the present dispute.

Plaintiff previously asserted against Defendant DePuy Synthes Products, Inc. ("Defendant" or "DePuy") claims for breach of the parties' Development Agreement, trade secret misappropriation under the Delaware Uniform Trade Secrets Act ("DUTSA") and the federal Defend Trade Secrets Act ("DTSA") and conversion. (D.I. 2 ¶¶ 125-159). On December 19, 2025, the undersigned issued a Report and Recommendation ("R&R") that recommended these claims be dismissed. (D.I. 43). In that same R&R, the undersigned recommended that Plaintiff's claim for breach of the parties' Interest Purchase Agreement ("IPA") be allowed to proceed. (D.I. 43; *see also* D.I. 2 ¶¶ 111-124). Both parties objected. (D.I. 46 & 47).

On March 20, 2026, Judge Hall overruled both parties' objections and adopted the undersigned's R&R. (D.I. 72). In that Order, she directed Plaintiff to file any "request[s] to amend to cure the above deficiencies" by April 6, 2026. (*Id.* at 4). On April 6, 2026, Plaintiff attempted to seek leave to amend his complaint using the undersigned's procedure for doing so. (D.I. 77; *see also* D.I. 121 (renewing the motion)). The Court denied that request because Plaintiff failed to even mention why good cause existed to amend the scheduling order. (*See* D.I. 138).[1] Plaintiff was given one final opportunity to seek amendment with the proper showing. (*Id.* at 8; *see also* D.I. 139 (setting deadline for renewed request)). On July 7, 2026, Plaintiff renewed his request for leave to amend. (D.I. 142). Defendant opposes amendment. (D.I. 145).

## II. LEGAL STANDARD

A party may amend its pleading once as a matter of course within twenty-one days of either (1) service of the pleading or (2) if a responsive pleading is required, the earlier of service of such responsive pleading or a motion under Federal Rule of Civil Procedure 12(b), (e) or (f). FED. R. CIV. P. 15(a)(1). In all other instances, a party may only amend its pleading if it receives "the opposing party's written consent or the court's leave," which the court should "freely give . . . when justice so requires." FED. R. CIV. P. 15(a)(2). A court should grant leave unless the moving party has unduly delayed, exhibited bad faith or dilatory motive or repeatedly failed to cure deficiencies of prior amendments, or if allowing amendment either is futile or would unduly prejudice the opposing party. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990) ("[L]eave to amend should be granted freely."). The

[1] At all relevant times, the agreed-upon deadline for Plaintiff to amend his complaint was January 26, 2026. (*Compare* D.I. 53-1 at 10, *with* D.I. 59 ¶ 2).

non-movant bears the burden of showing why leave to amend should not be granted. *See Sander v. Light Action, Inc.*, C.A. No. 10-684-LPS, 2012 WL 985576, at *4 (D. Del. Mar. 21, 2012).

If a party seeks leave after a deadline imposed by the scheduling order, then the more stringent "good cause" standard of Rule 16 applies. *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020); *see also* FED. R. CIV. P. 16(b)(4). This "good cause" inquiry "focuses on the moving party's burden to show due diligence" in belatedly seeking amendment and not prejudice to the non-movant. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010); *see also* FED. R. CIV. P. 16(b) advisory committee's note to the 1983 amendment.

## III. DISCUSSION

Under the scheduling order, the deadline to amend the complaint was January 26, 2026. (D.I. 59 ¶ 2). Plaintiff filed the present renewed motion several months after that deadline. (D.I. 142). DePuy continues to oppose amendment because Plaintiff purportedly lacks good cause to amend under Rule 16 and because, in DePuy's view, the proposed amendment would be futile and prejudicial under Rule 15. (*See generally* D.I. 145).

### A. Good Cause Under Rule 16

On August 3, 2026 and while the present motion was pending, Judge Hall resolved the parties' objections to two of the undersigned's recent rulings. (*See* D.I. 158). At that hearing, Judge Hall clarified that Plaintiff need not show good cause to amend his pleading to cure deficiencies identified in the now-adopted R&R. (D.I. 164, Ex. A at 10:8-23). All of Plaintiff's proposed amendments can be fairly characterized as addressing deficiencies that the Court identified in ruling on the motion to dismiss. (*See generally* D.I. 43).

Plaintiff adds factual allegations to support his breach of the IPA claim (Count I). (*See* D.I. 142, Ex. B ¶¶ 166-83). He attempts to revive his breach of the Development Agreement claim (Count II) by pleading facts to support new theories of how DePuy's payment obligations accrued

prior to the agreement's natural expiration. (*See id.* ¶¶ 184-93). Plaintiff also now attempts to assert quasi-contract claims (proposed Counts IV-VI) as alternative theories of liability, seemingly in response to the Court's skepticism regarding his breach of contract theories. (*See* D.I. 142, Ex. B ¶¶ 205-21). And as to the new trade secret allegations, the Court previously found that the Section 5.5.2 license covered the purportedly misappropriated intellectual property (D.I. 43 at 10-12); the new allegations simply attempt to revive the misappropriation claim notwithstanding this apparent license to DePuy. These amendments attempt to address deficiencies identified in the adopted R&R and, under the circumstances here, Plaintiff does not need to show good cause to amend.

**B. Undue Delay Under Rule 15**

Because the parties' briefing occurred before Judge Hall clarified the "good cause" issue, DePuy focused its timeliness arguments almost exclusively on diligence under Rule 16. (*See* D.I. 145 at 3-6). Those arguments were based on Plaintiff having the necessary facts to amend well before the deadline and Plaintiff's purported error in waiting until the Court ruled on the initial motion to dismiss. (*See* D.I. 145 at 4-5).[2] But the undersigned has recently found that a party who waits until a court rules on a motion to dismiss before seeking amendment is not necessarily precluded from showing diligence under Rule 16. *Belvac Prod. Mach., Inc. v. Adonis Acquisition Holdings LLC*, C.A. No. 25-166-JLH-EGT, 2026 WL 905314, at *2 (D. Del. Apr. 2, 2026); *see also United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 249 (3d Cir. 2016). To the extent that DePuy makes the same arguments as to undue delay under

[2] DePuy also emphasizes the fact that Plaintiff waited over a year before seeking the proposed amendments. (D.I. 145 at 1). To the extent that DePuy is suggesting that such a delay is presumptively unreasonable, the Court disagrees. *See Victaulic*, 839 F.3d at 252 (under similar circumstances, sixteen-month delay was not "presumptively unreasonable").

Rule 15 (*see* D.I. 145 at 5-6), the Court reaches the same result. *See Santoro v. Tower Health*, — F.4th —, 2026 WL 2543842, at *6-7 (3d Cir. Aug. 28, 2026). There is no undue delay here.

**C. Futility Under Rule 15**

DePuy also argues that all of Plaintiff's proposed amendments are futile. Futility of amendment is determined under the same standard as a motion to dismiss under Rule 12(b)(6). *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The Court addresses DePuy's arguments as to each proposed amended (or new) claim in turn.

1. Count I – Breach of the IPA

First, Plaintiff seeks to add additional factual support and new theories to his claim for breach of the IPA. (*See, e.g.*, D.I. 142, Ex. B ¶¶ 169-70). Because the Court previously found that Plaintiff stated a claim under a disproportionate forfeiture theory, the Court will mostly not parse the new theories and will permit amendment for everything except equitable estoppel.[3] *See Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 421 n.9 (D.N.J. 2021); *see also* FED. R. CIV. P. 8(d)(2). This is especially appropriate given that DePuy largely does not oppose these amendments. (*See* D.I. 145 at 6-10; *but see* D.I. 145 at 9 n.3 (opposing equitable estoppel allegations being added to Count I)).

2. Count II – Breach of the Development Agreement (Failing to Pay Acquisition Payment)

Plaintiff seeks to revive his claim for breach of the Development Agreement in Count II with several new theories. First, although TechMah did not satisfy the conditions to obligate DePuy's purchase of TechMah until after the Development Agreement's expiration on April 1, 2024, Plaintiff now alleges that TechMah's right to be purchased accrued prior to that expiration

---

3 *See infra* note 8 and accompanying text.

date and survived the agreement's expiration. (*See* D.I. 142 at 8-9; *see also id.*, Ex. B ¶¶ 184-93). Plaintiff's argument is creative, but the claim still fails. (*See* D.I. 142 at 9).

The Development Agreement does have a survival clause (Section 9.6.1), and the survival clause does incorporate acquisition payment provisions from Section 4.2 of the Development Agreement. (*See* D.I. 2, Ex. A § 9.6.1).[4] But Section 4.2 provides two distinct rights. First, after a proof of concept for Release 2 is approved, "[DePuy] will commit in writing to acquire [TechMah] in accordance with the terms and conditions set forth in the [IPA]." (*Id.* § 4.2). Second, upon completion of Sections 2.2.3 and 3.2.2 of the Work Plan, "[DePuy] will acquire [TechMah] in accordance with the terms and conditions set forth in the [IPA]." (*Id.*). The problem with Plaintiff's theory is that it conflates the accrual of the first right (*i.e.*, that once a proof of concept for Release 2 is approved, DePuy will commit to purchase TechMah subject to certain conditions) with the accrual of the second right (*i.e.*, that once Sections 2.2.3 and 3.2.2 of the Work Plan are completed, DePuy will acquire TechMah under the IPA).

Indeed, under Plaintiff's reading, timely completion of the Work Plan submission deadlines would be irrelevant because DePuy would be obligated to purchase TechMah once the Release 2 proof of concept was approved – regardless of whether the conditions in the Work Plan were timely met. A reading that makes terms surplusage is disfavored. *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021). To avoid the Work Plan conditions being surplusage, Section 4.2 is naturally read to provide two distinct rights that accrue separately – the

---

4 Copies of the Development Agreement and IPA are not attached to the proposed amended complaint. (*See* D.I. 142, Exs. A-C). But they are expressly relied upon and integral to the proposed pleading. (*See, e.g.*, D.I. 142, Ex. B. ¶ 121 (Development Agreement); *id.* ¶ 170 (IPA)). The Court thus refers to both Agreements in reviewing the proposed amendments. *In re Burlington*, 114 F.3d at 1426. Citations in this opinion will be to the agreements as attached to the original (and currently operative) complaint.

obligation to commit to purchasing (after the Release 2 proof of concept received approval) and the obligation to consummate the committed-to purchase (after Section 2.2.3 and Sections 3.2.2 (and other conditions in the IPA) were satisfied). The plain language of the Development Agreement stands in the way of Plaintiff's first new theory that DePuy's obligation to purchase TechMah accrued before the Development Agreement expired. Amendment would be futile.

Plaintiff presents a second new theory – namely, that Section 4.2's acquisition conditions were satisfied prior to the Development Agreement's expiration and thus TechMah is entitled to the IPA's payment obligations.[5] (*See* D.I. 142 at 8-9; *id.*, Ex. B ¶ 193). As discussed above, Section 4.2 requires completion of Sections 2.2.3 and 3.2.2 of the Work Plan in order to trigger DePuy's obligation to acquire TechMah (and thus TechMah's right to be purchased). (D.I. 2, Ex. A § 4.2). DePuy argues that Plaintiff failed to meet the Section 2.2.3 condition (D.I. 145 at 8), which required TechMah to obtain 510(k) clearance from the FDA for the Release 2 Product "no later than January 31, 2024." (D.I. 2, Ex. A at Annex A § 2.2.3.1). Plaintiff readily admits that the FDA did not grant 510(k) clearance for the Release 2 Product until July 11, 2024. (*See* D.I. 142, Ex. B ¶ 189). Plaintiff nevertheless attempts to get around this reality by alleging that (1) DePuy cannot enforce the January 31, 2024 deadline because DePuy materially contributed to missing the deadline and (2) the Development Agreement's natural expiration date was extended because of Force Majeure Events (namely, delays caused by third party laboratories, suppliers and the FDA review process). (*Id.* ¶ 190).

---

5 The Court frankly does not understand Plaintiff's new approach to the Development Agreement. Because Plaintiff no longer alleges termination under Section 9.4, Plaintiff's recovery under the new Development Agreement theories appears identical to that available under the IPA. Plaintiff even recognizes that the theories are identical. (*See* D.I. 142 at 9). Yet breach of the IPA is already part of this case.

As to DePuy's purported delay, Section 2.2.3 of the Development Agreement's Work Plan required 510(k) clearance by January 31, 2024. Although he now alleges that DePuy materially contributed to missing this deadline, Plaintiff identifies no actions by DePuy from before the deadline that caused delay – material or otherwise. (*See* D.I. 142, Ex. B ¶ 190). Indeed, all Plaintiff alleges is that "[t]he interval between submission [December 2023] and clearance [July 11, 2024]" was because of excusable delays or delays by DePuy. (*Id.*). But Plaintiff barely identifies any conduct by DePuy at all, only mentioning an issue with DePuy's subject matter experts, and there is no date provided. The proposed amendments do not permit the Court to reasonably infer that DePuy's conduct contributed – materially or at all – to TechMah missing the January 31, 2024 deadline to obtain 510(k) clearance for the Release 2 Product.

As to the expiration date extension, Section 9.1 provides that the April 1, 2024 expiration date "will be extended during the pendency of a Force Majeure Event." (D.I. 2, Ex. A § 9.1). The agreement defines Force Majeure Event as "an event outside the reasonable control of a Party, including: . . . (d) government order, law, or actions; . . . (g) telecommunication breakdowns, power outages or shortages, or inability or delay in obtaining services or supplies of adequate or suitable materials . . . ." (*Id.* § 1.1.35(d), (g)). According to Plaintiff, the FDA review process is a "government order, law or action[]" that extended the Development Agreement's term until the FDA granted approval. (*See* D.I. 142 at 9). DePuy disagrees, arguing that the FDA's approval was expressly contemplated as part of the Development Agreement and thus cannot qualify as a Force Majeure Event. (D.I. 145 at 9 n.4; *see, e.g.*, D.I. 2, Ex. A at Annex A § 2.2.3.1). The Court agrees with DePuy.

The Development Agreement defines a Force Majeure Event as "an event outside the reasonable control of a party" and lists numerous examples: "acts of God"; floods, fires,

earthquakes, pandemics, or explosions; war or other civil unrest; embargoes; telecommunication breakdowns, power outages, or "inability or delay in obtaining services or supplies." (*See* D.I. 2, Ex. A § 1.1.35). But at the same time, the Development Agreement expressly contemplated the FDA's regulatory approval process and placed the burden of obtaining (and risk of not obtaining) that approval on TechMah. (*See id.* § 2.5.1 (obligating TechMah to obtain all necessary regulatory approval)). And reading government action to include conduct that the Development Agreement expressly contemplated is contrary to the rule that force majeure clauses are to be narrowly construed. 30 WILLISTON ON CONTRACTS § 77:31 (4th ed.). The FDA's 510(k) approval is simply not government action that can be considered a Force Majeure Event. *Cf. Stroud v. Forest Gate Dev. Corp.*, 2004 WL 1087373, at *5 (Del. Ch. May 5, 2004) (construing force majeure provision to exclude events "reasonably foreseeable in the ordinary course" of the obligations contemplated by the contract); *Kyocera Corp. v. Hemlock Semiconductor, LLC*, 886 N.W.2d 445, 452-53 (Mich. Ct. App. 2015) (refusing to construe force majeure provision in a manner that would "relieve plaintiff from the very risk it contracted to assume"). Plaintiff's second theory for the Development Agreement thus does not state a claim, making amendment futile.[6]

As for his last new theory under the Development Agreement, Plaintiff asserts that DePuy is equitably estopped from enforcing the January 31, 2024 deadline and the April 1, 2024 expiration date. (*See* D.I. 142, Ex. B ¶¶ 46, 57, 105, 122, 169). In particular, Plaintiff alleges that TechMah relied on DePuy's conduct and TechMah lacked knowledge of DePuy's intent to invoke

6 In the Court's view, the delay-causing third-party events identified by Plaintiff fall under the "any other delay beyond [TechMah's] reasonable control" language of Section 9.5.2(b). (D.I. 2, Ex. B § 9.5.2(b)). Reading the term Force Majeure Event to include these third-party delays would render their use in Section 9.5.2(b) surplusage. *See Active Asset Recovery, Inc. v. Real Est. Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11-12 (Del. Ch. Sept. 10, 1999) (exclusion of a term "speaks volumes" in light of other terms); *Manti Holdings*, 261 A.3d at 1208 (rule against surplusage).

those dates. (*See* D.I. 142 at 10; *see also id.*, Ex. B ¶ 57). "To establish estoppel[,] it must be shown that [1] the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; [2] relied on the conduct of the party against whom estoppel is claimed; and [3] suffered a prejudicial change of position as a result of his reliance." *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990). Any such reliance must be reasonable. *Monterey Invs., Inc. v. Healthcare Props., L.P.*, 1997 WL 367038, at *5 (Del. Ch. June 26, 1997). Plaintiff argues that reliance is generally a fact issue that precludes dismissal. (*See* D.I. 142 at 10). But reliance is unreasonable "as a matter of law" in the presence of a non-waiver provision like the one in the Development Agreement.[7] *Marta v. Mut. Life Ins. Co. of N.Y.*, 887 F. Supp. 722, 727 (D. Del. 1995). Amending the complaint to add these equitable estoppel theories would be futile.[8]

3. <u>Count III – Breach of the Development Agreement (Retaining Confidential Information)</u>

Plaintiff attempts to assert an entirely new claim for breach of the Development Agreement based on DePuy's retention of confidential information that does not qualify as Work Product IP. (*See* D.I. 142, Ex. B ¶¶ 196-97). This new claim is based on Section 9.5.1 of the Development Agreement, which provides:

> Subject to Section 9.6, upon the expiration or termination of this Agreement for any reason: . . . except as otherwise expressly permitted herein, each Party will promptly return to the other Party all of such other Party's Confidential Information and any other

---

[7] It is doubtful Plaintiff would have been able to show TechMah changed its position in reliance on DePuy's conduct. *See Wilson ex rel. Wilson v. Am. Ins. Co.*, 209 A.2d 902, 902-04 (Del. 1965) (finding no change in position after insurance policy expired). TechMah was required to continue product development under the IPA after the Development Agreement expired. (*See* D.I 2, Ex. B § 6.01(a)(B)). The Court need not decide the issue, however, because Plaintiff's alleged reliance is unreasonable in light of the non-waiver provision.

[8] The same reasoning and conclusion apply to the IPA because of its non-waiver provision. (*See* D.I. 2, Ex. B § 10.5). Amending Count I to add this equitable theory is thus futile.

> information or materials supplied by such Party to the other Party in connection with this Agreement.

(D.I. 2, Ex. B § 9.5.1(a)). In Plaintiff's view, some of the improperly retained materials were simply confidential information not rising to the level of Work Product IP (D.I. 142, Ex. B ¶¶ 196-97), whereas others were created after the Development Agreement expired, thereby falling outside the definition of Work Product (and consequently Work Product IP) (*id.* ¶ 198). Plaintiff also claims that all Work Product had to be returned upon termination of the Development Agreement notwithstanding any rights conveyed by the agreement's broad license. (*See id.* ¶ 199). In DePuy's view, it was permitted to retain the complained-of materials under the "except as otherwise expressly permitted" carve-out of Section 9.5.1 because the Section 5.5.2 license falls within that exception (and thus overrides the return obligation). (D.I. 145 at 8).

Fundamentally, the parties dispute the characterization of the materials that DePuy retained after the Development Agreement expired – namely, whether the retained material is Work Product IP (DePuy's view) or something else (Plaintiff's view). The problem with Plaintiff's view is that the allegations are not plausibly supported by sufficient factual material or the allegations are contradicted by the Development Agreement itself. Indeed, as to the improperly retained materials in Paragraph 197, Plaintiff baldly asserts that those three non-descript documents were not necessary or useful for the exploitation of the Work Product and thus cannot qualify as Work Product IP. (D.I. 2, Ex. A § 1.1.18 ("'Work Product IP' means any Intellectual Property Controlled by [TechMah] . . . that (a) covers, claims, or is incorporated into, or (b) that is otherwise necessary or useful for, in each case ((a) and (b)), the exploitation of the Work Product . . . .")). But the Court has been provided nothing about the contents of those documents, their purpose or utility. As to the remaining materials identified, Plaintiff claims that those cannot qualify as Work Product IP as a matter of law because no Work Product could possibly be generated after the Development

Agreement expired. (D.I. 142 at 7-8; *see also id.*, Ex. B ¶ 198). But that is wholly inconsistent with the fact that the Section 5.5.2 license to Work Product IP covers after-arising information. (*See* D.I. 2, Ex. B §§ 1.1.52, 1.1.18, 5.5.2; *see also infra* Section III.C.4). And that same license permitted DePuy to continue using Work Product IP (*i.e.*, everything necessary and useful for exploiting Work Product) even after the Development Agreement expired. (D.I. 2, Ex. B § 5.5.2).

Plaintiff claims that Section 9.5.2(b) would be surplusage if DePuy already had the right to retain all Work Product IP under Section 5.5.2. (D.I. 142, Ex. B ¶¶ 199-200). Not so. Section 9.5.2(b) only applies when the Development Agreement is terminated pursuant to Section 9.2 because of a material breach by TechMah. (*See* D.I. 2, Ex. B § 9.5.2(b)). In that situation, Section 9.5.2 gives DePuy the right to purchase "all rights, title, and interest in and to the Work Product, including the Work Product IP." (*Id.* § 9.5.2(b)(i)). Section 9.5.2(b) is thus concerned with acquiring ownership of the Work Product IP, not the mere right to use the Work Product IP as conveyed by the Section 5.5.2 license. (*See id.* § 5.5.2). Because Section 9.5.2(b) conveys complete ownership in limited situations (which would prevent TechMah from doing ***anything*** with the Work Product), it conveys a more complete set of rights than is conveyed by the Section 5.5.2 license. Both provisions still have meaning and Plaintiff's surplusage argument lacks merit.

Because Plaintiff has failed to plausibly allege that DePuy retained material outside the scope of the broad Section 5.5.2 license to Work Product IP, the new claim under the Development Agreement's Section 9.5.1 would be futile.[9]

---

[9] As to Plaintiff's claim that Section 9.6.1 requires even Work Product IP to be returned (D.I. 142, Ex. B ¶ 199), the Court is unpersuaded. Where the two provisions conflict, the Section 5.5.2 license is the more specific and thus controlling provision, allowing DePuy to continue using the complained-of material. *See Thompson St. Cap. Partners IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A.3d 1151, 1166 (Del. 2025). It would be nonsensical to allow DePuy to continue using the material into perpetuity but nevertheless require DePuy to return it.

4. Counts VII & VIII – Trade Secret Misappropriation

Next, Plaintiff again attempts to revive his trade secret claims. The Court has twice noted that Plaintiff's proposed trade secret counts failed to state a claim in light of the Development Agreement's broad license. (*See* D.I. 43 at 10-12; D.I. 138 at 5-7). This time, Plaintiff alleges that certain materials were developed after the expiration of the Development Agreement and therefore are not covered by the license provided in Section 5.5.2 of that agreement. (*See* D.I. 142 at 7-8). Plaintiff's claim still fails.

Despite Plaintiff's focus on "Work Product" (D.I. 142 at 8), the scope of the license afforded by Section 5.5.2 of the Development Agreement is based on "Work Product IP" (*see* D.I. 2, Ex. A § 5.5.2). "Work Product IP" is ultimately defined in broad and sweeping terms, including "any Intellectual Property Controlled by [TechMah]" that covers, claims, is incorporated into or "is otherwise necessary or useful for . . . exploit[ing] the Work Product." (*Id.* § 1.1.18). And the Development Agreement's definition of "Intellectual Property" takes the breadth even further, including "all rights, title and interest in and to all now ***or hereafter existing*** intellectual property and industrial rights of every kind and nature . . . ."[10] (*Id.* § 1.1.52 (emphasis added)). The defined term Intellectual Property thus expressly contemplates trade secrets generated in the future and, by extension, so does Work Product IP. (*See id.* §§ 1.1.52, 1.1.18). Because the Section 5.5.2 license is perpetual, it continues to give DePuy the right to use any intellectual property generated by TechMah that is useful for exploiting the Work Product – even if the intellectual property is generated after the Development Agreement's expiration. (*See* D.I. 2, Ex. A §§ 1.1.19,

---

10 Because of this broad scope, Plaintiff's reliance on *Yesh Music v. Lakewood Church*, 2012 WL 524187 (S.D. Tex. Feb. 14, 2012), is misplaced. The agreement in *Yesh* concerned the defendant's right to use a song owned by the plaintiff. *Id.* at *1. The relevant license expressly limited any future uses after the term expired. *Id.* at *4-5. Here, Section 5.5.2 of the Development Agreement lacks such an express limitation.

1.1.52, 1.1.17, 1.1.18, 5.5.2; *see also id.* §§ 9.5.1(b), 9.6.2). This result is not "illogical" as Plaintiff contends (D.I. 142 at 8), but rather what the unambiguous language of the Development Agreement requires.[11] Plaintiff's proposed amended trade secret claims are thus futile.

5. Counts IV, V and VI – Quasi-Contract Theories

Plaintiff also seeks to assert two groups of new quasi-contract theories. The first group (proposed Counts IV and VI) is based on the work that TechMah performed after the Development Agreement expired on April 1, 2024. (D.I. 142 at 6-7). The second group (proposed Count V) is based on work allegedly performed outside the scope of the Development Agreement. (*Id.* at 7). When a contract governs the parties' relationship concerning certain subject matter, a quasi-contract claim based on the same is generally barred. *See, e.g.*, *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *17 (Del. Super. Ct. Aug. 16, 2021).

Starting with the first group (Counts IV and VI), Plaintiff contends that these unjust enrichment and quantum meruit claims are strictly limited to benefits conferred on DePuy after the Development Agreement's expiration on April 1, 2024. (*See* D.I. 142 at 6). And because the Development Agreement expired, no agreement governed the parties' relationship concerning product development. (*Id.*). DePuy disagrees, arguing that the IPA continued to govern the parties' relationship even after the Development Agreement expired, thus barring any quasi-contract claim. (D.I. 145 at 9-10). The Court agrees with DePuy.

In Plaintiff's view, work done after the Development Agreement's expiration was not governed by any agreement, but that ignores the fact that Section 6.01(a)(B) of the IPA required TechMah to use "commercially reasonable efforts to develop and commercialize" the Products

---

[11] The Court understands Plaintiff's frustration with this result. But "[p]arties have a right to enter into good and bad contracts" and this Court is obligated to "enforce[] both." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

outlined in the Work Plan until the IPA was terminated. (*See* D.I. 2, Ex. B § 6.01(a)(B); *see also id.* § 2.11(g)(i); D.I. 2, Ex. A § 1.1.67). The IPA thus required TechMah to continue to develop the products outlined in the Work Plan even after the Development Agreement's expiration. The IPA was terminated on January 13, 2025, and there is no suggestion that any work was done after that. (D.I. 142, Ex. B ¶ 201). Counts IV and VI are thus barred because the parties' relationship was governed by an agreement (the IPA) and, as such, amendment would be futile. *See Intermec*, 2021 WL 3620435, at *17 (unjust enrichment); *Flooring Sols., Inc. v. Columbia Wegman Newark, LLC*, 2026 WL 1747005, at *7 (Del. Super. Ct. June 17, 2026) (quantum meruit).

Moving to the second group (Count V), Plaintiff attempts to add a theory of unjust enrichment based on work done beyond the scope of the Development Agreement. (D.I. 142, Ex. B ¶ 212). Specifically, Plaintiff alleges that "[a]pproximately 75 to 80% of the work done" for DePuy was outside the scope of the Development Agreement (and the IPA). (*Id.*). In Plaintiff's view, these purported "scope expansions" constitute unjust enrichment that no agreement between the parties can remedy. (*Id.* ¶¶ 214-15). But as already explained, the IPA governs activities such as commercializing the Products. (*See* D.I. 2, Ex. B § 6.01(a)(B)). And Plaintiff unequivocally admits that scope expansion was part of a "multi-week commercialization exercise" to commercialize the Products. (D.I. 142, Ex. B ¶ 63). Section 6.01(a)(B) expressly covers commercializing the Products. Count V is therefore barred as well.

* * *

In sum, only the minor proposed amendments for Count I are not futile. Leave to amend is denied for all other claims.

**D. Prejudice Under Rule 15**

Lastly, DePuy argues in two sentences that it will be unduly prejudiced if Plaintiff is granted leave to amend because DePuy will have to prepare defenses against new theories of liability. (D.I. 145 at 10). But "[a] mere claim of prejudice is not sufficient; there must be some showing" that DePuy will be prejudiced, such as being "'unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had . . . the amendments been timely.'" *Dole*, 921 F.2d at 488 (quoting *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989)). No such showing has been made. In any event, because only minor amendments to an already proceeding claim are being allowed by this Order, the scope of this case will not be "fundamentally altered" such that DePuy will suffer "substantial or undue prejudice" from the amendment. *Cureton*, 252 F.3d at 273-74.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff's motion for leave to amend (D.I. 142) is GRANTED-IN-PART and DENIED-IN-PART. Plaintiff may amend to add the non-futile allegations for Count I. IT IS FURTHER ORDERED that, on or before September 9, 2026, Plaintiff shall docket a Second Amended Complaint consistent with this Order and which attaches all relevant exhibits.

Dated: September 4, 2026

UNITED STATES MAGISTRATE JUDGE